**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **LOUISIANA CHILDREN'S MEDICAL CENTER, d/b/a/ LCMC HEALTH**, | |
| Plaintiff | |
| *v.* | |
| **MERRICK GARLAND,** in his official capacity as **ATTORNEY GENERAL OF THE UNITED STATES,** | CIVIL ACTION |
| | No. 2:23-cv-1305, c/w 23-cv-1890 |
| **UNITED STATES DEPARTMENT OF JUSTICE,** | JUDGE LANCE M. AFRICK SECTION I |
| **FEDERAL TRADE COMMISSION**, | |
| and | MAGISTRATE JUDGE MICHAEL NORTH DIVISION 5 |
| **UNITED STATES OF AMERICA,** | |
| Defendants | |

THIS DOCUMENT RELATES TO:

Case No. 23-cv-1890

**MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT OF RESPONDENTS
LOUISIANA CHILDREN'S MEDICAL CENTER AND HCA HEALTHCARE, INC.**

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION .................................................................................................... 1

BACKGROUND ...................................................................................................... 3

    A.    The Hospitals' Acquisition Was Implemented Under Louisiana's COPA Program, Which Displaces Federal Antitrust Law For Hospital Mergers .......................................................................... 3

    B.    Federal Law Regulates Mergers Under Sections 7 And 7A Of The Clayton Act. ............................................................................... 5

    C.    The Commission Seeks To Enforce Section 7A Against The Hospitals' State-Controlled Merger ............................................... 6

LEGAL STANDARD ............................................................................................... 7

ARGUMENT .......................................................................................................... 8

    I.    The Acquisition Satisfies The Requirements For State Action Immunity ............ 8

    A.    Conduct Attributable To A State Is Exempt From The Federal Antitrust Laws .................................................................... 8

    B.    The Acquisition Is Attributable To The State Of Louisiana .................... 10

    II.    The State Action Doctrine Applies To Section 7A Of The Clayton Act ............. 13

    A.    The Federalism And Textual Rationales For The State Action Doctrine Apply With Full Force To Section 7A ...................................... 13

    B.    The Commission's Arguments Should Be Rejected ............................... 20

    III.    The Public Interest Strongly Favors Respondents And The State ...................... 24

CONCLUSION .................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Acoustic Systems, Inc. v. Wenger*,
   207 F.3d 287 (5th Cir. 2000) ................................................23

*Bond v. United States*,
   572 U.S. 844 (2014)..........................................................15

*Cal. Retail Liquor Dealers Ass'n v. Midcal Alum., Inc.*,
   445 U.S. 97 (1980)............................................9, 17, 19, 21

*City of Columbia v. Omni Outdoor Advert.*,
   499 U.S. 365 (1991)........................................................8, 10

*DFW Metro Line Servs. V. Sw. Bell Tel. Corp.*,
   988 F.2d 601 (5th Cir. 1993) ....................................10, 11, 12

*FTC v. CCC Holdings Inc.*,
   605 F. Supp. 2d 26 (D.D.C. 2009) ........................................8

*FTC v. Lake*,
   181 F. Supp. 3d 692 (C.D. Cal. 2016) ...................................8

*FTC v. Phoebe Putney Health Sys., Inc.*,
   568 U.S. 216 (2013)................................................... *passim*

*FTC v. Ticor Title Ins. Co.*,
   504 U.S. 621 (1992)................................................... *passim*

*FTC v. Weyerhaeuser Co.*,
   665 F.2d 1072 (D.C. Cir. 1981) .........................................23

*Hunnicutt v. Tafoya-Lucero*,
   2022 WL 832566 (D.N.M. Mar. 21, 2022).............................9

*La Union Del Pueblo Entero v. FEMA*,
   608 F.3d 217 (5th Cir. 2010) .............................................18

*Landgraf v. USI Film Prods.*,
   511 U.S. 244 (1994).........................................................19

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)...........................................................7

*Midwestern Mach. Co. v. Nw. Airlines, Inc.*,
   392 F.3d 265 (8th Cir. 2004) .............................................12

# TABLE OF AUTHORITIES

**Page(s)**

*Moore v. Harper*,
    143 S. Ct. 2065 (2023) ...................................................................................21

*N.C. State Bd. of Dental Exam'rs v. FTC*,
    574 U.S. 494 (2015) .............................................................................. *passim*

*Parker v. Brown*,
    317 U.S. 341 (1943) .............................................................................. *passim*

*Patrick v. Burget*,
    486 U.S. 94 (1988) .......................................................................................12

*Printz v. United States*,
    521 U.S. 898 (1997) .....................................................................................21

*S. Motor Carriers Rate Conf., Inc. v. United States*,
    471 U.S. 48 (1985) ................................................................................ *passim*

*Sackett v. EPA*,
    143 S. Ct. 1322 (2023) ...........................................................................15, 19

*Sims v. Great Am. Life Ins. Co.*,
    469 F.3d 870 ..............................................................................................22

*SmileDirectClub v. Battle*,
    4 F.4th 1274 (11th Cir. 2021) (en banc) ....................................................23

*Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Par.*,
    171 F.3d 231 (5th Cir. 1999) .....................................................................15

*Town of Hallie v. City of Eau Claire*,
    471 U.S. 34 (1985) .......................................................................................9

*Uetricht v. Chi. Parking Meters, LLC*,
    64 F.4th 827 (7th Cir. 2023) ......................................................................17

*United States v. Blavatnik*,
    168 F. Supp. 3d 36 (D.D.C. 2016) .............................................................14

*United States v. Farley*,
    11 F.3d 1385 (7th Cir. 1993) .....................................................................20

*United States v. Smithfield Foods, Inc.*,
    332 F. Supp. 2d 55 (D.D.C. 2004) ......................................................14, 19

*VRC LLC v. City of Dallas*,
    460 F.3d 607 (5th Cir. 2009) .......................................................................8

# TABLE OF AUTHORITIES

**Page(s)**

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*,
529 U.S. 765 (2000) ........................................................................17

*Weatherly v. Pershing, LLC*,
945 F.3d 915 (5th Cir. 2019) ..........................................................22

*Z Techs. Corp. v. Lubrizol Corp.*,
753 F.3d 594 (6th Cir. 2014) ..........................................................12

**STATUTES**

15 U.S.C. § 12(b) .............................................................................17

15 U.S.C. § 18 ...........................................................................5, 14, 17

15 U.S.C. § 18a .......................................................................... *passim*

La. Stat. § 40:2254.1 ................................................................ *passim*

La. Stat. § 40:2254.4 ...........................................................3, 4, 11, 16

La. Stat. § 40:2254.6 ..........................................................................4

La. Stat. § 40:2254.9 ..........................................................................3

**OTHER AUTHORITIES**

16 C.F.R. pt. 802 ...............................................................................20

16 C.F.R. § 801.1 ..............................................................................18

Fed. R. Civ. P. 56(c) ...........................................................................7

H.R. Rep. No. 94-1373 (1976).....................................................5. 19

Int'l Competition Policy Advisory Committee to the Attorney General, Final
Report (2000) ..................................................................................16

La. Admin. Code Title 48, pt. XXV, § 517 ........................................4

17A Moore's Federal Practice – Civil § 124.07 ...............................22

iv

## INTRODUCTION

The Supreme Court has long held that conduct attributable to States is exempt from "the federal antitrust laws." *FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 219 (2013); *Parker v. Brown*, 317 U.S. 341, 351 (1943). Respondents Louisiana Children's Medical Center (LCMC) and HCA Healthcare, Inc. (HCA) ("the Hospitals") consummated a hospital acquisition that was authorized and supervised by the Louisiana Attorney General under a Louisiana statute that expressly grants immunity from federal antitrust laws. Under the state action immunity doctrine, the acquisition is exempt from "the federal antitrust laws." *Phoebe Putney*, 568 U.S. at 219.

One federal antitrust law is Section 7A of the Clayton Antitrust Act. 15 U.S.C. § 18a. Section 7A is an enforcement tool for Section 7, which prohibits anticompetitive mergers. When it applies, Section 7A imposes a pre-merger waiting period that can last up to a year, notice to the Federal Trade Commission, and compliance with lengthy, burdensome, and expensive requests for information. Indeed, while the Commission has, in this litigation, almost exclusively focused on Section 7A's pre-merger notification filing, compliance with Section 7A requires much more than just notice. Compliance is a lengthy process that routinely costs millions of dollars, entails voluminous productions of documents and sensitive company data, and imposes a waiting period that the Commission can extend to a year or more. That process exists, by design, only to enable the Commission to block consummation of mergers that would violate Section 7.

The Commission concedes that the state action doctrine applies to Section 7. There is also no legitimate dispute that the Hospitals' acquisition qualifies for state action immunity. Nevertheless, the Commission asks this Court for an injunction under Section 7A that halts integration of the hospitals and mandates compliance with its waiting period and disclosure

requirements.[1]  The Commission makes this request on the unprecedented theory that Section 7A, uniquely among the federal antitrust laws, is carved out from the state action doctrine.

No injunction is warranted, and the Hospitals are entitled to summary judgment.  On the merits, the Commission fails on both issues presented.  First, the acquisition satisfies the "authorization" and "supervision" elements for state action immunity.  Under Louisiana law, the State Attorney General issued a "certificate[] of public advantage" (COPA), along with a detailed set of terms and conditions implementing active supervision, thus placing the merged entity under State "supervision and control."  La. Stat. § 40:2254.1.  Accordingly, for this transaction, the Legislature intends to "substitute state regulation … for competition," and "grant[] … state action immunity … [from] federal antitrust laws."  *Id.*  Based on these legal provisions and undisputed facts, the acquisition meets the requirements for immunity as a matter of law.

Second, contrary to the Commission's view, the state action doctrine applies to Section 7A of the Clayton Antitrust Act, just as it applies to the other federal antitrust laws.  Like each of the other antitrust laws, Section 7A contains no clear statement that Congress intended it to apply to States or state-controlled mergers, or that it should be interpreted "to compromise the States' ability to regulate their domestic commerce."  *S. Motor Carriers Rate Conf., Inc. v. United States*, 471 U.S. 48, 56 (1985).  And—as this case vividly illustrates—applying Section 7A to state-controlled mergers would egregiously interfere with state regulatory programs.

Regardless of the merits as to Section 7A, moreover, the Commission cannot obtain injunctive relief because the discretionary factors overwhelmingly favor Respondents and the State.  *On the one hand*, a pointless waiting period does not serve the public interest.  And it would

---

[1] The logical corollary of the Commission's argument is not only that it needs actual notice of the transaction (which, of course, it already has), but that the Hospitals would also need to comply with a burdensome second request for information if the Commission were to issue one.

indeed be pointless.  The purpose of Section 7A is to prevent consummation of mergers that violate Section 7, particularly to avoid the unscrambling problem that arises once an illegal merger has been consummated.  For a merger that is exempt from Section 7, however, there will never be any basis to unscramble it, and Section 7A therefore serves no purpose.  *On the other hand*, an injunction would affirmatively harm the public interest.  The State of Louisiana has determined that the acquisition serves the interest of the people of the State.  Enjoining integration would nullify that policy choice and severely impinge on the State's COPA program.

## BACKGROUND

### A.   The Hospitals' Acquisition Was Implemented Under Louisiana's COPA Program, Which Displaces Federal Antitrust Law For Hospital Mergers

Louisiana is one of 19 States that have enacted COPA statutes.  SOMF ¶¶ 1–2.  Louisiana's statute creates a regulatory program to authorize healthcare mergers and place them under State "supervision and control."  La. Stat. § 40:2254.1.  The statute dictates "the intent of the legislature" to "substitute state regulation of [healthcare] facilities for competition between facilities," and to "grant[] … state action immunity … [from] federal antitrust laws."  *Id.*

The Louisiana Attorney General (AG), as head of the Louisiana Department of Justice ("Department") is tasked with administering the statute.  Parties may apply to the Department for a "certificate of public advantage" (COPA).  *Id.* § 40:2254.4.  After review, the Department may grant a COPA, subject to "terms and conditions," only if it "finds that the agreement is likely to result in lower health care costs or is likely to result in improved access to health care or higher quality health care without any undue increase in health care costs."  *Id.*

After approval, the Department must "active[ly] supervis[e]" the merger.  *Id.* § 40:2254.9(3).  The Department has authority to promulgate supervision regulations, enforce

compliance with a COPA's terms and conditions, and ultimately to "revoke a certificate." *Id.*; *see id.* §§ 40:2254.4, 40:2254.6(A); La. Admin. Code tit. 48, pt. XXV, § 517.

The Hospitals applied for COPA approval on October 10, 2022.  SOMF ¶ 13.  LCMC is non-profit, community-based health system based in New Orleans, Louisiana.  *Id.* ¶ 15.  HCA owned and operated three Louisiana hospitals through a joint venture with Tulane University of Louisiana.  *Id.* ¶ 16.  Under the transaction (the "Acquisition"), LCMC would acquire Tulane University Medical Center, Lakeview Regional Medical Center, and Tulane Lakeside Hospital. *Id.* ¶ 17.  The Acquisition was designed to increase access to high-quality clinical services and health care in the New Orleans region and to expand hubs for specialty care, innovation, and academic medicine.  *Id.* ¶ 19.  LCMC committed to making $220 million in capital investments to modernize the facilities (such as investing in robotic surgical systems), offer new medical services (such as kidney, pancreas, liver, bone marrow, and stem cell transplants), and add new specialty care units.  *Id.* ¶¶ 20, 62.

The Department reviewed the application's detailed substantive information regarding the transaction, the facilities, and the likely effects on health care and competition in the state.  *Id.* ¶¶ 22–28.  The Department obtained input from expert consultants, and from the public through a notice and comment period and public hearing.  *Id.* ¶ 23–26.  Based on this review, the Department concluded that the Acquisition "is likely to result in lower health care costs or is likely to result in improved access to health care or higher quality health care without any undue increase in health care costs."  La. Stat. § 40:2254.4; SOMF ¶¶ 27, 29.  The Department approved the Acquisition and granted a COPA on December 28, 2022.  SOMF ¶ 29.

The COPA's "Terms and Conditions" provide for comprehensive supervision.  *Id.* ¶¶ 30–34, 36–38.  Under the "Rate Review" provision, LCMC "may not contract with a third-party payor

for a change in rates" without prior written approval.  *Id.* ¶ 31.  LCMC must also submit quarterly, semi-annual, and annual reports, enabling the Department to ensure that LCMC's activity remains consistent with the State's policy goals.  *Id.* ¶¶ 32–33.  If the Department determines at any time that LCMC's activities are not consistent with those policy goals, it may impose "a plan to correct any deficiency."  *Id.* ¶ 33.  And the Department may "revoke the COPA" if it is "not satisfied with any submitted corrective action plan," if LCMC fails to comply with the Terms and Conditions, or if the Department "otherwise determines that the transaction is not resulting in lower health care costs or greater access to or quality of health care."  *Id.* ¶ 34.  Relying on the COPA and the Department's supervision, the Hospitals closed the transaction on January 1, 2023, and announced the closing on January 3, 2023.  *Id.* ¶ 35.

**B.   Federal Law Regulates Mergers Under Sections 7 And 7A Of The Clayton Act**

The principal federal statutes regulating mergers are Section 7 and Section 7A of the Clayton Antitrust Act.   Under Section 7, "[n]o person shall acquire" ownership or assets of "another person" if "the effect of such acquisition may be substantially to lessen competition."  15 U.S.C. § 18.

The Hart-Scott-Rodino Antitrust Improvements Act (HSR) added Section 7A.  *Id.* § 18a. It prohibits consummation of mergers without notice to the Commission, imposes a pre-merger waiting period, and conditions the ending of that waiting period on compliance with the Commission's information requests.  *Id.*  The purpose of Section 7A is to enable federal antitrust authorities to assess and prevent mergers that violate Section 7, and to avoid the difficulty of unwinding an illegal merger after it has already been consummated.  H.R. Rep. No. 94-1373, p. 5 (1976).  The Commission wields control over the length of the waiting period and the scope of the information requests, which typically cover a wide range of sensitive company documents and information.  This process, known as a "second request" for information, can last up to a year or

more.  § 18a(e)(1)(A); SOMF ¶¶ 45, 48–49.  The cost of responding to a second request routinely

exceeds $4 million and can reach $20 million.  SOMF ¶¶ 45–47, 50.  Parties who merge without

compliance are subject to daily penalties that can exceed $50,000 per day.  § 18a(g)(1); SOMF

¶ 44.  Section 7A also authorizes the Commission to seek injunctive relief.  But injunctive relief is

discretionary: A court "may order compliance," and "may grant such other equitable relief as the

court in its discretion determines is necessary or appropriate."  § 18a(g)(2)(A), (C).

### C.  The Commission Seeks To Enforce Section 7A Against The Hospitals' State-Controlled Merger

To the Hospitals' knowledge, the Commission has never enforced Section 7A against a

COPA-approved merger.  Instead, the Commission has submitted comments and participated in

state-led hearings during COPA review processes without raising Sections 7 or 7A.  SOMF ¶ 39.

The Commission has now reversed course.  Here, it did not participate in the COPA

process.  *Id.* ¶ 40.  Three months after the Acquisition closed, the Commission insisted that the

Hospitals make a Section 7A filing and halt integration of the hospitals while it determined whether

the transaction violates Section 7, and threatened penalties for failure to comply.  *Id.* ¶¶ 41–43.

After the Hospitals sought declaratory relief in this Court, the Commission filed this petition in the

District of Columbia, asserting that the Acquisition violated Section 7A.  Dkt. 1.

The petition seeks an injunction (a) mandating that the Hospitals comply with Section 7A's

waiting period and disclosure requirements, (b) prohibiting any further integration of the Hospitals

"until expiration of the statutory waiting period," and (c) requiring LCMC to give the Commission

30 days' notice "before acquiring any hospital or other medical facility, either directly or indirectly,

in the State of Louisiana for the duration of the hold separate order," regardless of whether it is

required to do so under Section 7A.  Dkt. 1 at 2, 9–10.  As authority for these requests, the

Commission invokes § 18a(g)(2)(A) and (C).  *Id.* at 2.

The Hospitals moved to transfer the petition to this Court.  In opposition, the Commission argued that the court should not even decide the underlying immunity question.  Dkt. 25 at 13, 17. According to the Commission, Louisiana's COPA statute and the Louisiana AG's approval and supervision of the Acquisition were irrelevant, and the only question was whether state action immunity applies to Section 7A, so there was no need to transfer the case to Louisiana.  *Id.*

Judge Amy Berman Jackson disagreed and transferred the case to this Court on May 23, 2023.  Dkt. 31.  One part of Judge Jackson's reasoning remains particularly relevant now.  As she explained, "the essential fact here that cannot be ignored is that Louisiana has already granted the COPA and the transaction has already taken place." *Id.* at 21.  Thus, "the state action question"— that is, whether this transaction meets the requirements for state action immunity—"must be resolved first." *Id.* at 22.  After all, if the Acquisition is "exempt" from "federal antitrust enforcement"—meaning the FTC cannot obtain relief against the merger under the Clayton Act, regardless of what it determines the Acquisition's competitive effects to be—then requiring a waiting period and costly compliance with information requests would be "an empty exercise now." *Id.*  For those reasons, transfer was warranted to permit this Court to determine "the effect of the COPA." *Id.*

After the case was transferred, this Court granted the Hospitals permission to move for summary judgment.  No. 23-cv-1305, Dkt. 67.

## LEGAL STANDARD

*Standard for summary judgment.*  Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  While the court must draw reasonable inferences in favor of the nonmovant, the nonmoving party must do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

*Standard for injunctive relief.*  Injunctive relief is discretionary under Section 7A, which provides that the Court "may order compliance," and "may grant such other equitable relief as the court in its discretion determines necessary or appropriate."  15 U.S.C. § 18a(g)(2)(A), (C).  To obtain an injunction, the Commission must demonstrate that the Hospitals violated Section 7A, *see id.* § 18a(g)(2), and that the well-established equitable factors favor injunctive relief.  *See, e.g.*, *VRC LLC v. City of Dallas*, 460 F.3d 607, 611 (5th Cir. 2009) (requiring proof of "success on the merits," "irreparable injury," balancing of harms, and showing of "public interest").  "Mandatory injunctions are particularly disfavored," moreover, "and are generally not granted "unless extreme or very serious damage will result."  *FTC v. Lake*, 181 F. Supp. 3d 692, 704 (C.D. Cal. 2016).  At minimum, in all cases the Commission must demonstrate that the "public equities" favor an injunction.  *See FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 35–36 (D.D.C. 2009).

## ARGUMENT

### I.   THE ACQUISITION SATISFIES THE REQUIREMENTS FOR STATE ACTION IMMUNITY

### A.   Conduct Attributable To A State Is Exempt From The Federal Antitrust Laws

The Supreme Court has long presumed that Congress—absent a clear statement to the contrary—would "not intend to compromise the States' ability to regulate their domestic commerce."  *Motor Carriers*, 471 U.S. at 56; *accord Parker*, 317 U.S. at 351.  Accordingly, the Court has consistently interpreted federal antitrust statutes to exempt "state action or official action directed by a state."  *Parker*, 317 U.S. at 351.  "Relying on principles of federalism and state sovereignty," the state action doctrine provides that "the federal antitrust laws" do "not apply to anticompetitive restraints imposed by the States 'as an act of government.'"  *City of Columbia v. Omni Outdoor Advert.*, 499 U.S. 365, 370 (1991).

The Court first applied this principle in *Parker*, holding that the phrase "[e]very person" in the Sherman Act was insufficiently clear to include States or "official action directed by a state."

317 U.S. at 351.  The Court has since applied this to merger challenges under Section 7 of the

Clayton Act, *Phoebe Putney*, 568 U.S. at 222–25, and has repeatedly held "that federal antitrust

laws are subject to supersession by state regulatory programs."  *FTC v. Ticor Title Ins. Co.*, 504

U.S. 621, 632–33 (1992); *see Hunnicutt v. Tafoya-Lucero*, 2022 WL 832566, at *4 (D.N.M. Mar.

21, 2022) ("The state action exemption … appl[ies] to all of the federal antitrust laws.").

Crucially, the exemption extends to "nonstate actors carrying out the State's regulatory

program."  *Phoebe Putney*, 568 U.S. at 219.  This is essential, the Court has explained, to avoid

"compromis[ing] the States' ability to regulate their domestic commerce."  *Motor Carriers*, 471

U.S. at 56.  "If *Parker* immunity were limited to the actions of public officials, … a State would

be unable to implement programs that restrain competition among private parties."  *Id.*  Any

"plaintiff could frustrate" the State's regulatory program "merely by filing suit against the

regulated private parties, rather than the state officials who implement the plan."  *Id.* at 56–57.

In light of those concerns, "anticompetitive acts of private parties are entitled to immunity"

if they satisfy two elements.  *Phoebe Putney*, 568 U.S. at 225; *see Cal. Retail Liquor Dealers Ass'n

v. Midcal Alum., Inc.*, 445 U.S. 97, 105 (1980) (adopting the two-part test).  **First,** the State must

have authorized the challenged anticompetitive conduct—it must be "clearly articulated and

affirmatively expressed as state policy."  *Phoebe Putney*, 568 U.S. at 225.  "[N]o express mention

of anticompetitive conduct" is required.  *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 41–42

(1985).  But "the State must have foreseen and implicitly endorsed the anticompetitive effects."

*N.C. State Bd. of Dental Exam'rs v. FTC*, 574 U.S. 494, 507 (2015).

**Second,** the conduct must be "actively supervised" by the State.  *Phoebe Putney*, 568 U.S.

at 225 (quoting *Midcal*, 445 U.S. at 105).  Active supervision means "that state officials have and

exercise power to review particular anticompetitive acts of private parties and disapprove those

that fail to accord with state policy." *Dental Exam'rs*, 574 U.S. at 507.  Its purpose is "not to determine whether the State has met some normative standard, such as efficiency," *Ticor*, 504 U.S. at 634, but to ensure that the State "exercise[s] ultimate control over" the challenged conduct, *id.* This is an "objective standard[]," and "does not depend on the subjective motivation of the individual actors." *DFW Metro Line Servs. V. Sw. Bell Tel. Corp.*, 988 F.2d 601, 605 (5th Cir. 1993).  To satisfy active supervision, a state official must (1) "have the power to veto or modify" the challenged conduct, (2) "review the substance of the anticompetitive decision," and (3) make a "decision" that the conduct "accord[s] with state policy." *Dental Exam'rs*, 574 U.S. at 515.

### B.   The Acquisition Is Attributable To The State Of Louisiana

The State's express grant of immunity, and its "supervision and control," La. Stat. § 40:2254.1, of the Acquisition, far exceed these two requirements.

**1.**   For clear articulation, the Louisiana Legislature unequivocally authorized "mergers … and consolidations among health care facilities for which certificates of public advantage are granted."  La. Stat. § 40:2254.1.  The express "intent of the legislature" is to "substitute state regulation … for competition," and to "grant[] … state action immunity" from "federal antitrust laws." *Id.*  This crystal clear statement authorizing and immunizing COPA-approved mergers goes well beyond "implicitly endors[ing]" allegedly anticompetitive conduct. *Dental Exam'rs*, 574 U.S. at 507.  There is no question that "suppression of competition is the 'foreseeable result'" of the COPA statute. *Columbia*, 499 U.S. at 373.  The statute as implemented here meets the clear articulation requirement. *See, e.g.*, *DFW Metro Line*, 988 F.2d at 605 (statute provided that state "regulation shall operate as a substitute for … competition").

**2.**   Next, the Department's review and approval of the Acquisition satisfies active supervision.  The Department had power to veto or modify the Acquisition, reviewed its substance, and affirmatively decided to allow the Acquisition as consistent with state policy.

**a.**   The first step in any active-supervision inquiry is to identify the "particular anticompetitive acts" that must be supervised.  *Dental Exam'rs*, 574 U.S. at 507, 515; *DFW Metro Line*, 988 F.2d at 605–06 (court must "identif[y] the challenged conduct" to evaluate "active supervision").  Here, the challenged act is the closing of LCMC's Acquisition on January 1, 2023, which the Commission asserts violated Section 7A.  Dkt. 1 ¶¶ 5, 10, 13.

Under Louisiana's COPA statute, the Department had "power to veto or modify" the Acquisition as required for immunity.  *Dental Exam'rs*, 574 U.S. at 515.  The statute empowers the Department to grant or deny a COPA, and an application is automatically *denied* unless the Department acts.  La. Stat. § 40:2254.4(A)–(C).  The Department could also modify the Acquisition by imposing "terms and conditions" on approval of the COPA, *id.* § 40:2254.4(C), or by denying the COPA outright unless the Acquisition was modified.

The Department also "review[ed] the substance of" the Acquisition.  *Dental Exam'rs*, 574 U.S. at 515.  The application exhaustively detailed the substance of the Acquisition and its likely effects on health care and competition.  SOMF ¶ 18.  The Department reviewed the application and the substance of the Acquisition, retained expert consultants, provided a public notice-and-comment period, received input from a wide range of stakeholders, and held a public hearing on December 8, 2022.  *Id.* ¶¶ 22–28.  Based on that review, the Department affirmatively decided that the challenged conduct "accord[s] with state policy."  *Dental Exam'rs*, 574 U.S. at 515; SOMF ¶ 29.  Specifically, the Department concluded that the Acquisition "is likely to result in lower health care costs or … in improved access to health care or higher quality health care without any undue increase in health care costs."  La. Stat. § 40:2254.4; SOMF ¶¶ 27, 29.  The Department accordingly approved the Acquisition and granted a COPA.  *Id.* ¶ 29.

These undisputed facts easily meet the governing standard for active supervision. *See Dental Exam'rs*, 574 U.S. at 515. These circumstances are worlds apart from cases rejecting active supervision, where there was no state actor involved *at all* in the decision, *id.*; *see Patrick v. Burget*, 486 U.S. 94, 102 (1988); or where the anticompetitive conduct would take effect by default, subject only to a "negative option" by a passive state actor, *Ticor*, 504 U.S. at 638.

**b**. The Commission appears to contend that the Court must assess whether the Department has engaged in ongoing supervision *after* the Acquisition closed on January 1, 2023. *See* Dkt. 28 at 16. Not so. The relevant time for assessing immunity is the date when the Acquisition closed (January 1, 2023) because that is when the alleged violation of Section 7A occurred. That follows from the statute's text and purpose. The operative provision of Section 7A prohibits persons from "acquir[ing]" assets without observing the waiting period, and it is the "acqu[isition]" that triggers liability. 15 U.S.C. § 18a(a). Thus, the question is whether the State has supervised the *acquisition* itself, not what follows after the acquisition. That makes sense because the purpose of the statute is to identify and prevent anticompetitive mergers *before* they are *consummated*.

Even if post-acquisition supervision were required *for purposes of section 7*, the only forward-looking question for purposes of Section 7A would be whether there are procedures in place at the time of closing that facially provide for supervision in the future.[2] Any further inquiry would arise only in a subsequent, as-applied challenge under Section 7, not in an enforcement

---

[2] Moreover, no ongoing supervision is required to immunize a merger from Section 7. Under binding precedent, so long as the challenged anticompetitive act is supervised, "the future consequences of the action are irrelevant." *DFW Metro Line*, 988 F.2d at 605–07. And for a Section 7 claim, the challenged act is "the merger itself." *Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 271 (8th Cir. 2004); *see Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 602 (6th Cir. 2014) (explaining that "a merger is a discrete act, not an ongoing scheme," and that "price increases following a merger or acquisition are not overt acts" of anticompetitive conduct).

action for retroactive compliance with Section 7A.  *Cf. Ticor*, 504 U.S. at 629–31, 638–40 (reviewing as-applied challenge to supervision of price fixing regulation).

And here, the COPA's terms and conditions facially provide for ongoing supervision. SOMF ¶¶ 30–34, 36–38.  Under these provisions, the Department controls prices charged to third-party payors, which LCMC may not change without "prior written approval."  *Id* ¶ 31.  LCMC is subject to regular reporting requirements regarding its progress towards various quality, cost, and access benchmarks, this first of which was filed on May 31, 2023.  *Id.* ¶¶ 32, 36, 38.  The AG also controls LCMC's ongoing activities, and may at any time impose "a plan to correct any deficiency" if "an activity of [LCMC] is inconsistent with the [State's] policy goals."  *Id.* ¶ 33.  Finally, the AG may "revoke the COPA" for failure to comply with supervision conditions or if the "transaction is not resulting in lower health care costs or greater access to or quality of health care." *Id.* ¶ 34.  These procedures satisfy active supervision against the Commission's facial challenge.

Indeed, even in a context where ongoing supervision is necessary, "[a]ctive supervision need not entail day-to-day involvement in [a supervised entity's] operations or micromanagement of its every decision."  *Dental Exam'rs*, 574 U.S. at 494.  The State's "review mechanisms" need only provide "'realistic assurance' that [the challenged] anticompetitive conduct 'promotes state policy, rather than merely the party's individual interests.'"  *Dental Exam'rs*, 574 U.S. at 515 (citation omitted).  That is precisely what the COPA's supervision provisions accomplish.

## II.  THE STATE ACTION DOCTRINE APPLIES TO SECTION 7A OF THE CLAYTON ACT

### A.  The Federalism And Textual Rationales For The State Action Doctrine Apply With Full Force To Section 7A

The only question, then, is whether state action immunity applies to Section 7A of the Clayton Antitrust Act, just as it applies to Section 7.  It does.  Mergers attributable to a State are "exempt" from "the federal antitrust laws."  *Phoebe Putney*, 568 U.S. at 219.  Section 7A is a

federal antitrust law.  Like the Sherman Act and Section 7 of the Clayton Act, Section 7A applies only to a "person," not a State, and lacks a clear statement that Congress intended "to compromise the States' ability to regulate their domestic commerce."  *Motor Carriers*, 471 U.S. at 56. Federalism principles, too, apply equally to Section 7A, and Section 7A undercuts state COPA programs by imposing waiting periods and penalties on state-controlled mergers.

    **1.**  Section 7A of the Clayton Antitrust Act is indisputably a federal antitrust law in both form and function.  It exists to prevent mergers that would violate Section 7 because they "substantially lessen competition."  15 U.S.C. § 18; *see United States v. Smithfield Foods, Inc.*, 332 F. Supp. 2d 55, 58 (D.D.C. 2004).  Its key provisions prohibit mergers during a waiting period and authorize the Commission to demand information solely for the purpose of assisting a Section 7 challenge.  15 U.S.C. § 18a(a).  Section 7A then imposes penalties for merging without observing the waiting period, enforceable "in a civil action brought by the United States."  *Id.* § 18a(g)(1). These penalties are a form of antitrust liability, as "there can be no reasonable dispute that an HSR Act civil penalty action arises 'under the antitrust laws.'"  *United States v. Blavatnik*, 168 F. Supp. 3d 36, 41 (D.D.C. 2016).  And the penalties arise not merely for failure to give notice, but for *merging* too soon.  *Id.* § 18a(a).  Because Section 7A is a "federal antitrust law[]," *Phoebe Putney*, 568 U.S. at 219, mergers attributable to the State are "exempt" from Section 7A, just as they are exempt from Section 7.  *Id.*

    **2.**  *Parker*'s federalism rationale applies forcefully to Section 7A.  A key reason for the state action doctrine is "respect for ongoing regulation by the State."  *Ticor*, 504 U.S. at 633.  To that end, the Supreme Court has consistently invoked a clear statement rule to avoid interpreting antitrust statutes in a way that would "compromise the States' ability to regulate their domestic commerce."  *Motor Carriers*, 471 U.S. at 56.  Specifically, the Court has repeatedly held that state

action—including private conduct authorized and supervised by the State—is exempt from federal antitrust statutes because they lack a clear statement that they apply to States or state action. *Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Par.*, 171 F.3d 231, 234 (5th Cir. 1999) (discussing *Parker*'s clear statement rule and explaining that "[t]he doctrine of clear statement is vital to the concreteness of federalism").  This is grounded in "the well-established principle" that federal courts must "be certain of Congress' intent before finding that federal law overrides' the 'usual constitutional balance of federal and state powers.'" *Bond v. United States*, 572 U.S. 844, 858 (2014) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)). Where traditional state powers are concerned, "Congress [must] enact *exceedingly clear language* if it wishes to significantly alter the balance between federal and state power." *Sackett v. EPA*, 143 S. Ct. 1322, 1341 (2023) (emphasis added).  As a result, "the federal antitrust laws are subject to supersession by state regulatory programs." *Ticor*, 504 U.S. at 632–33.

"[R]espect for ongoing regulation by the State" also requires extending immunity to private parties. *Id.* at 633.  "If *Parker* immunity were limited to the actions of public officials, … a State would be unable to implement programs that restrain competition among private parties." *Motor Carriers*, 471 U.S. at 56.  Any "plaintiff could frustrate" a State's regulatory plan "merely by filing suit against the regulated private parties, rather than the state officials who implement the plan." *Id.* at 56–57.  This would "reduce *Parker*'s holding to a formalism." *Id.* at 57.  Immunity therefore extends to private parties both to "preserv[e] the State's own administrative policies," *Ticor*, 504 U.S. at 633–34, and to prevent federal antitrust laws from "compromis[ing] the States' ability to regulate their domestic commerce," *Motor Carriers*, 471 U.S. at 56.

Applying Section 7A to COPA-authorized mergers would frustrate the State's regulatory program and "reduce *Parker*'s holding to "a formalism." *Id.* at 57.  The Louisiana Legislature has

expressed the State's policy to "substitute state regulation … for competition" among health care facilities.  La. Stat. § 40:2254.1.  The AG spent months in the approval process, determined that the Acquisition serves Louisiana's public interest, entered into an arrangement for ongoing supervision, and authorized the transaction to close immediately.  *Supra* p.4.  In direct contradiction, Section 7A would impose a waiting period—subject to a potential year-long extension, during which the merging parties must expend millions of dollars to comply with voluminous demands for data, documents, and depositions.  *Supra* pp.5–6.

The delay is particularly problematic because "lengthy review periods … may prove fatal to a transaction."  Int'l Competition Policy Advisory Committee to the Attorney General, Final Report 93 (2000).  Further, the COPA statute itself sets time limits for review and approval of the merger.  La. Stat. § 40:2254.4(C).  And the State's approval can be contingent on terms and conditions that depend on immediate integration of the facilities.  The Hospitals, for example, made specific commitments to the State, such as modernizing hospital assets, making capital investments, recruiting providers, and relocating services to increase patient access.  SOMF ¶¶ 20, 62.  Many of those commitments would have been hindered or impossible if the Acquisition had been delayed by Section 7A's waiting period.  *Id.*  Indeed, the Commission's attempt to use Section 7A to enjoin the acquisition—months after it closed under the COPA—starkly illustrates the disruption to state COPA programs that would occur if the state action doctrine did not apply.  *See* SOMF ¶¶ 51–63 (describing deleterious effects of the requested injunction).  In many instances, including here, Section 7A could effectively nullify the State's COPA program.  Indeed, potential merger parties may not engage with the AG in the first place if they would continue to bear the risk of a costly, protracted federal merger investigation irrespective of a COPA.

At bottom, applying Section 7A to a COPA-approved merger is in direct conflict with the State's regulatory approval process. Far from "respect for ongoing regulation by the State," *Ticor Title*, 504 U.S. at 633, it is an *affront* to ongoing regulation by the State.

**3.** Next, Congress used the operative word "person" the same way in Section 7A, Section 7, and the Sherman Act. *See* 15 U.S.C. § 18a ("no person shall acquire"), § 18 ("No person … shall acquire"), §§ 1–2 ("Every person who shall make"). This is dispositive. Under *Parker*'s clear statement rule, the phrase "[e]very person" in the Sherman Act did not include States or "action directed by a state." *Parker*, 317 U.S. at 351; *see Uetricht v. Chi. Parking Meters, LLC*, 64 F.4th 827, 833 (7th Cir. 2023) (recounting *Parker*'s reliance on "persons"). This accords with the firmly established "presumption that 'person' does not include the sovereign." *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 780 (2000). And—crucially—because the Sherman Act lacks a clear statement that it applies to States, it also does not apply to state-controlled private conduct. *Motor Carriers*, 471 U.S. at 56–57; *Midcal*, 445 U.S. at 105.

This same rationale applies to Section 7A. Just as in *Parker*, Section 7A applies only to "persons," not States. Just as in *Motor Carriers*, state-controlled conduct is also exempt, because to hold otherwise would reduce *Parker*'s holding to a mere "formalism." 471 U.S. at 56–57.

In previous briefing on this issue, the Commission argued that there is "no ambiguity in the word 'person'" under Section 7A, and that its regulations define "person" to exclude a State but include private parties. Dkt. 28 at 9. But neither the statute nor the regulation speaks to the issue here: whether state-controlled mergers are exempt. The Clayton Act, of which Section 7A is a part, defines "person" generally to include private parties, but its definition says nothing about States and—more importantly—nothing about state-controlled conduct. 15 U.S.C. § 12(b). The regulation, in turn, parrots the statute: It defines "person," but says nothing about state-controlled

conduct, and it expressly *excludes* States.  16 C.F.R. § 801.1(a)(1)–(2).  Absent a clear statement, the statute and regulation do not apply to States or state-controlled mergers, and neither the statute nor regulation contains any such clear statement.  Indeed, the only clear statement is that States are *exempt* under the regulation, which cuts in favor of the state action doctrine.  *Id.*[3]

**4.**  Two other provisions in Section 7A support the conclusion that state-controlled mergers are exempt.  The statute exempts 12 categories of mergers, and two categories embrace mergers covered by state action immunity, particularly when read in light of *Parker*'s clear statement rule.

**a.**  First are "transactions specifically exempted from the antitrust laws by Federal statute." 15 U.S.C. § 18a(c)(5).  Mergers that qualify for state action immunity are specifically exempted by the antitrust statutes themselves, as those statutes have been interpreted by the Supreme Court. That makes good sense.  If a transaction falls outside the other antitrust laws, there is no reason to impose Section 7A's requirements on it.

**b.**  Section 7A also exempts "transfers to or from … a State." § 18a(c)(4).  This is broad enough to include mergers attributable to the State through the state action doctrine.  After all, the authorization and supervision requirements are keyed to determining whether conduct is "the State's own." *Ticor*, 504 U.S. at 634–35.  In that light, the exemption for transactions "to or from … a State" comfortably applies to all mergers that qualify as state action.

---

[3] Not surprisingly, the Commission seeks no deference for its view of state action immunity. The Commission has never issued a regulation interpreting Section 7A to apply to state-controlled mergers.  Even if it had, no deference would be warranted.  A clear statement is required before courts will assume Congress meant to delegate authority over such a major question as whether to "compromise the States' ability to regulate their domestic commerce." *Motor Carriers*, 471 U.S. at 56.  The Supreme Court has accordingly never deferred to the Commission in its state action precedent.  In addition, a regulation is not entitled to deference when it merely parrots the statute. *La Union Del Pueblo Entero v. FEMA*, 608 F.3d 217, 222–23 (5th Cir. 2010).

**c.** But it would make no difference even if those two exemptions did not apply.  For the reasons explained above, applying Section 7A to state-controlled mergers would (at best) directly interfere with or (at worst) vitiate state COPA programs, and courts should not "lightly attribute" such an intent to Congress.  *Parker*, 317 U.S. at 351.  Indeed, an "exceedingly clear statement" is required if Congress "wishes to significantly alter the balance between federal and state power." *Sackett*, 143 S. Ct. at 1341.  Section 7A is nowhere close.  It applies only to "persons," a key textual element cutting in favor of state action immunity.  And the only relevant clear statement— that "States" are expressly exempt, 15 U.S.C. § 18a(c)(4)—cuts *in favor of* applying the state action doctrine and in *favor* of the reasoning in *Midcal* and *Motor Carriers*, not against it.

Rather than properly applying the governing clear statement rule, the Commission relies on an implicit negative inference drawn from the fact that "state action immunity" is not specifically listed among the 12 exemptions.  But an implicit inference is not a clear statement. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 288 & n.2 (1994) (a negative inference is "no substitute for clear statement").  In truth, the only way to adopt the Commission's position is to draw inferences *against the State* at every turn: first in the word "person," then in the (c)(5) exemption, then in the (c)(4) exemption, and then in the statute as a whole.  That is contrary to the mandate from the Supreme Court to apply a clear statement rule *in favor of States*, and to interpret federal antitrust laws to exempt conduct attributable to a State.

**5.** It also makes no sense to apply Section 7A to state-controlled mergers.  The express purpose of pre-merger review is to avoid the unscramble-the-eggs problem that arises in a Section 7 enforcement action once an illegal merger has been consummated.  *Smithfield Foods, Inc.*, 332 F. Supp. 2d at 58; H.R. Rep. No. 94-1373 at 5.  But if a merger is exempt from Section 7 enforcement, there is no reason to subject it to Section 7A.  Congress recognized this by excluding

from Section 7A all transactions that are "specifically exempted from the antitrust laws."  15 U.S.C. § 18a(c)(5).  Judge Jackson recognized the same point in her transfer order, explaining that pre-merger review is "an empty exercise" for a merger that is "exempt" from "federal antitrust enforcement."  Dkt. 31 at 22.  This refutes the Commission's argument that exempting COPA-approved mergers will frustrate the purpose of Section 7A.  Dkt. 28 at 19–20.

Nor is the Commission correct when it says the state action exemption "cannot be decided unilaterally" in the first instance "by the merging parties."  Dkt. 28 at 11; *see id.* at 1, 14–17.  Merging parties routinely make unilateral determinations as to whether they are exempt, either because they fall below monetary thresholds or because they fit within the 12 statutory or 29 additional regulatory exemptions.  *See* 15 U.S.C. § 18a(a) (thresholds); *id.* § 18a(c) (exemptions); 16 C.F.R. pt. 802 (regulatory exemptions).  And if the Commission disagrees with the parties' determination, it may bring an enforcement action like this one for a court to answer the question, or the Department of Justice can seek penalties.  15 U.S.C. § 18a(g).  This is routine, and Congress plainly contemplated it when it enacted the statute.  *See, e.g.*, *United States v. Farley*, 11 F.3d 1385, 1388 (7th Cir. 1993) (enforcement action where defendant asserted the acquisition "fell within the investment-only exemption contained in the HSR Act"); Compl. (Dkt. 1).  It is one thing to argue that defendants in such enforcement actions must establish that state action immunity applies; it is quite another to argue, as the FTC does, that the exemption can never be raised at all.

**B.   The Commission's Arguments Should Be Rejected**

**1.**   The Commission claims that Section 7A is excluded from the state action doctrine because Section 7A's requirements are "procedural," and the state action doctrine supposedly applies only to "substantive" antitrust laws.  Dkt. 28 at 7; *see* No. 23-cv-1305, Dkt. 36 at 3 (arguing that the "state-action doctrine . . . is a defense to *substantive* antitrust law," not "to the *procedural* requirements of the HSR Act").  This is wrong on multiple levels.

**a.**  State action precedent has never distinguished between substantive and procedural antitrust laws.  The Commission cites no state action case even mentioning such a distinction, which is a strong reason to reject it.  *See Moore v. Harper*, 143 S. Ct. 2065, 2086 (2023) (rejecting attempt to introduce substance/procedure distinction without support in precedent).  Instead, the question is whether Section 7A is one of "the federal antitrust laws," *Phoebe Putney*, 568 U.S. at 219, and whether applying it to state-controlled mergers could "compromise the States' ability to regulate their domestic commerce."  *Motor Carriers*, 471 U.S. at 56.  On that point, the Supreme Court's reasoning strongly supports applying the state action doctrine to 7A.  "If *Parker* immunity were limited to the actions of public officials, … a State would be unable to implement programs that restrain competition among private parties."  *Id*.  So too, if *Parker* immunity did not extend to 7A, States would be unable to implement COPA programs.

That reasoning—not any slippery distinction between substance and procedure—undergirds each state action case.  *See Phoebe Putney*, 568 U.S. at 236 (relying on "respect for the States' coordinate role" and hesitance to "read[] the federal antitrust laws to restrict the States' sovereign capacity to regulate their economies"); *Ticor*, 504 U.S. at 633 (relying on "respect for ongoing regulation by the State"); *Midcal*, 445 U.S. at 103 (relying on "federal structure").  For good reason:  It is easy to imagine ostensibly procedural requirements that would interfere with state regulatory programs as much as any supposedly substantive rule, like a law imposing a one-year delay on all state-controlled mergers or a law requiring States to take certain steps as part of a COPA approval process.  More broadly, there is no doubt that ostensibly procedural requirements can implicate federalism concerns.  *E.g.*, *Printz v. United States*, 521 U.S. 898, 902 (1997) (Congress may not commandeer state officials to carry out procedures of federal law).  "Procedure, after all, is often used as a vehicle to achieve substantive ends."  *Moore*, 143 S. Ct. at 2086.

**b.** The Commission insists that Section 7A is merely procedural because it does not impose liability for anticompetitive mergers and because it applies to some transactions that are ultimately not anticompetitive. Dkt. 28 at 9–10. If anything, this makes a *stronger* case for the state action doctrine to apply to Section 7A. It makes no sense to subject a state-controlled merger that is *exempt* from Section 7 to a waiting period and filing requirements to determine whether it *might otherwise violate* Section 7. Moreover, the Commission's position would gratuitously delay even transactions like this one that unequivocally qualify for state action immunity from Section 7 and *also* have no anticompetitive effect, undermining state COPA programs without serving any antitrust purpose at all. Only a bureaucrat could love such an expansionist reading of the statute.

Section 7A is also not purely procedural in any meaningful sense. *See Weatherly v. Pershing, LLC*, 945 F.3d 915, 925 & n.48 (5th Cir. 2019) ("distinctions between substance and procedure are inherently ephemeral and thus difficult to draw"). After all, it prohibits consummating mergers during the waiting period, conditions that waiting period on responding to substantive information requests, and imposes steep penalties, accruing daily, for failure to comply. *See Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 884–85 (state law imposing a fine is substantive); *cf.* 17A Moore's Federal Practice - Civil § 124.07 ("[D]amages are a matter of substantive law"). Those penalties are a form of antitrust liability, not a mere procedural hoop.

**2.** Next, the Commission insists that state action is a "defense," unlike sovereign immunity, and the "state action defense" "does not "immunize a defendant from suit" or "from being investigated." Dkt. 4 at 7–8. That is irrelevant. The Hospitals have never claimed to be immune, in the Eleventh Amendment jurisdictional sense, from suit or subpoena. The Hospitals simply contend that the state action doctrine exempts their conduct from the antitrust laws, and that they can assert that defense in an enforcement action like this one. And while the Commission insists

that the state action doctrine can only be asserted as a defense, what it actually means is that the state action doctrine cannot be asserted as a defense when it comes to Section 7A.

The Commission's argument rests on a false analogy to a subpoena, claiming that "the HSR Act … is no different from other investigations that may begin with the issuance of a subpoena." *Id.* at 8. Section 7A is vastly different. It prohibits merging without observing a waiting period, conditions that waiting period on compliance with information requests that dramatically exceed the scope of subpoenas and other compulsory processes, imposes a filing fee and substantial monetary penalties, and permits the Commission to seek to enjoin mergers that fail to comply. By contrast, subpoenas issued under the FTC Act do not impose a waiting period, filing fee, or penalties, and they do not enjoin mergers. *See FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1073 (D.C. Cir. 1981). A separate enforcement proceeding requiring proof on the merits—and allowing defenses on the merits—is required to enjoin a merger. *Id.*

Regardless, the Commission's analogy is also irrelevant. The appropriate question is not whether Section 7A is a form of compulsory process; it is whether Section 7A contains a clear statement that Congress truly meant to "compromise the States' ability to regulate their domestic commerce." *Motor Carriers*, 471 U.S. at 56. It does not.

The Commission's cited cases are inapposite, too. Dkt. 1 at 8; Dkt. 28 at 13–14. The Commission emphasizes cases about interlocutory appeals from state-action determinations under the collateral order doctrine. *E.g., SmileDirectClub v. Battle*, 4 F.4th 1274, 1277 (11th Cir. 2021) (en banc); *see Acoustic Systems, Inc. v. Wenger*, 207 F.3d 287, 291 (5th Cir. 2000). At most, the cases hold that *Parker* is not the same as Eleventh Amendment immunity, which the Hospitals have never disputed. These cases are perfectly consistent with the Hospitals' assertion of state action as a defense to this enforcement action.

*     *     *

As the Supreme Court has long recognized and repeatedly reaffirmed, the federal antitrust laws leave room for States to structure and execute their regulatory programs in accordance with their sovereign interests.  The federal antitrust laws also leave room for the States to carry out their regulatory programs through private actors.  Section 7A is just such a federal antitrust law.  And the State of Louisiana's COPA is just such a regulatory program.  The Court should reject the Commission's novel theory, which threatens to interfere with the State's health care policy and assessment of the public interest of its citizens, in precisely the ways the state action doctrine has long sought to avoid.  The Hospitals are entitled to judgment as a matter of law.

### III. THE PUBLIC INTEREST STRONGLY FAVORS RESPONDENTS AND THE STATE

Regardless of how this Court rules on whether the state action doctrine applies to Section 7A, the public interest and other discretionary factors weigh heavily in favor of allowing Respondents and the State of Louisiana to implement their COPA-approved Acquisition.  The key point is that the Acquisition was at least exempt from liability under Section 7 when it closed on January 1, 2023.  *Supra* pp.10–13.  As Judge Jackson concluded, if the Acquisition is exempt from Section 7, then the waiting period and merger review under Section 7A would be "an empty exercise now."  Dkt. 31 at 22.  In other words, if Section 7 liability is impossible, then there will never be a reason to undo the Acquisition, and Section 7A serves no purpose.  Needless to say, a pointless pre-merger waiting period serves no public interest.

Likewise, the Commission cannot show that irreparable harm would result if the Hospitals are not subjected to purposeless compliance with Section 7A.  The Commission is not irreparably harmed because it can pursue its supposed investigation through other, legitimate investigatory powers if it chooses.  For the waiting period, there is no irreparable harm to law enforcement or the public because the Acquisition is exempt from Section 7 itself.

24

On the other side of the scale, enjoining integration would severely undercut the State's policy choice and implementation of its COPA program, harming the citizens of Louisiana. Because States have primary regulatory authority over their own domestic affairs, the state action doctrine establishes that "federal antitrust laws are subject to supersession by state regulatory programs." *Ticor*, 504 U.S. at 632–33. The State has expressed its policy choice to "substitute state regulation" of healthcare facilities "for competition between facilities." La. Stat. § 40:2254.1. The Louisiana Legislature and AG have applied that state policy to the Acquisition—a purely intrastate healthcare merger within the State's core regulatory authority. The State has determined that the Acquisition serves the public interest of its citizens. The Commission's request to enjoin the merger would undermine that policy choice and "compromise the States' ability to regulate their domestic commerce." *Motor Carriers*, 471 U.S. at 56.

Even more concretely, enjoining integration will harm patient care and cause other harms to healthcare in Louisiana. SOMF ¶¶ 51–63. The Acquisition was designed to benefit the people of Louisiana by allowing the Hospitals to increase access to high-quality clinical services and health care in the New Orleans region, and the COPA application detailed the plan to achieve those benefits. *Id.* ¶¶ 19–20. The AG conditioned the COPA on LCMC's commitments that it would improve access to high-quality healthcare by modernizing hospital assets, making capital investments, recruiting providers, and relocating services. *Id.* ¶¶ 18–20. Those commitments will be delayed or rendered impossible if the Court halts further integration. *Id.* ¶¶ 51–63.

## CONCLUSION

For the foregoing reasons, this Court should deny each of the Commission's requests for injunctive relief and enter summary judgment in favor of the Hospitals.

Dated:  July 18, 2023

Kenneth W. Field
Benjamin F. Holt
Sean Marotta
Christopher M. Fitzpatrick
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
benjamin.holt@hoganlovells.com
ken.field@hoganlovells.com
sean.marotta@hoganlovells.com
chris.fitzpatrick@hoganlovells.com

Robert N. Stander
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
(202) 879-7628
rstander@jonesday.com

Sarah E. Welch
JONES DAY
901 Lakeside Ave.
Cleveland, OH 44114
(216) 586-7401
swelch@jonesday.com

*/s/ Diana Cole Surprenant*
E. Paige Sensenbrenner (#18429) – T.A.
Diana Cole Surprenant (#33399)
ADAMS AND REESE LLP
701 Poydras Street, Suite 4500
New Orleans, LA 70139
(504) 581-3234
paige.sensenbrenner@arlaw.com
diana.surprenant@arlaw.com

*Counsel for Louisiana Children's Medical Center*

Respectfully submitted,

*/s/ Sara Y. Razi*
Sara Y. Razi
Abram Ellis
Joshua Hazan
SIMPSON THACHER & BARTLETT LLP
900 G Street N.W.
Washington, D.C. 20001
(202) 636-5500
sara.razi@stblaw.com
aellis@stblaw.com
joshua.hazan@stblaw.com

Judy Y. Barrasso (#2814)
Christine M. Calogero (#36818)
Stephen R. Klaffky (#36211)
BARRASSO USDIN KUPPERMAN
FREEMAN & SARVER L.L.C.
990 Poydras Street, Suite 2350
New Orleans, LA 70112
(504) 589-9700
jbarrasso@barrassousdin.com
ccalogero@barrassousdin.com
sklaffky@barrassousdin.com

Harry Rosenberg (#11465)
PHELPS DUNBAR, LLP
Canal Place
365 Canal Street, Suite 2000
New Orleans, LA 70130
(504) 584-9219
harry.rosenberg@phelps.com

*Counsel for HCA Healthcare, Inc.*